Filed 2/27/23  P. v. Corona CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078593 |
| v. | (Super.Ct.No. RIF111209)) |
| ADRIAN CUEVAS CORONA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Judge.  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, and Alan Amann and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

Petitioner Adrian Cuevas Corona was involved in a confrontation between his group of young Hispanic men, in a car, and another, on foot.  At the end, a member of the other group was run over by a car and killed.

Although there were many eyewitnesses, their recollections of this shocking event understandably varied.  Thus, there was conflicting evidence as to whether petitioner was the driver of the car, or the person seen brandishing a rifle, or neither.  There was conflicting evidence as to whether the rifle was fired.  There was also conflicting evidence as to whether the driver ran over the victim deliberately or accidentally.  There was even conflicting evidence as to whether it was actually petitioner's group's car that ran over the victim.

Nevertheless, in 2004, in a jury trial, petitioner was found guilty of second degree murder.  (Pen. Code, § 187, subd. (a).)[1]  He was sentenced to 15 years to life in prison.

In 2021, he filed a petition for resentencing pursuant to section 1172.6.[2]  The trial court issued an order to show cause.  After considering the evidence,[3] the trial court found beyond a reasonable doubt "that the defendant did commit implied malice

---

[1]     All further statutory citations are to the Penal Code.

[2]     The petition was actually filed under former section 1170.95.  (Stats. 2018, ch. 1015, § 4, amended by Stats. 2021, ch. 551, § 2.)  Effective June 30, 2022, however, former section 1170.95 was renumbered as section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  We will use section 1172.6, somewhat anachronistically, to refer to whichever one of the two statutes was in effect at the relevant time.

[3]     The evidence consisted of the clerk's transcript  and reporter's transcript  of the trial, plus our opinion in petitioner's direct appeal.

2

murder."  It therefore denied the petition.  (See §§ 188, subds. (a)(2), (a)(3), 1172.6, subd. (d)(3).)

In this appeal, petitioner contends that:

(1)  The trial court may have found petitioner guilty on a natural and probable consequence theory, which is no longer valid.

(2)  The trial court could find petitioner guilty only on a theory on which the record shows the jury also relied.

We reject the first contention because it is based on the premise that "[t]he natural and probable consequence doctrine is a theory of implied malice."  That is simply wrong.

We reject the second contention because it is based on the premise that there is a right to trial by jury in a section 1172.6 proceeding.  Our sister courts have rejected this premise unanimously; moreover, the United States Supreme Court and the California Supreme Court have held that there is no right to trial by jury in analogous postconviction proceedings.

I

STATEMENT OF FACTS

On the night of July 13-14, 2003, at 8:30 p.m., petitioner borrowed his girlfriend's white Chrysler Sebring.  He promised to come back at 5:00 a.m. to take her to work.

Around 1:45 a.m., witnesses saw the Sebring in the parking lot of a shopping center in Moreno Valley.  One of the businesses in the shopping center was La Nueva Ronda, a nightclub that was just closing.

The Sebring was cruising the parking lot, burning rubber and acting "like a bumper car," "trying to hit another vehicle, stopping before [it] hit the other vehicle . . . ." There were four or five young men in it. One witness saw the person in the right rear seat of the Sebring pointing a rifle out the window.

Other cars in the parking lot were also cruising, burning rubber, and "driving radically." One was a gold Chevy Suburban.

Victim Eder Arcos was in the parking lot, behind his truck, with three or four male friends and one female friend. Petitioner's group "mad-dogged" them and asked where they were from.

Someone in the Sebring said, "[P]ull the gun out." Someone then stood up through the sunroof, pointed a rifle at the victim's group, and said he was going to shoot.

The victim went up to the driver's side of the Sebring and grabbed the rifle. His friends came running up to help him. The driver of the Sebring "floored" it, accelerating to 25 to 35 miles an hour. The victim — holding the rifle with one hand and the edge of the sunroof with the other — was either carried or dragged along. The gunman started punching the victim.

At the end of the parking lot, the Sebring made a U-turn "at high speed." The victim either fell or was pushed off the car. The Sebring then ran over him. There was conflicting testimony as to whether the rear wheel ran over him as he fell or whether the Sebring circled back around and sped up before running over him.

4

Two of the victim's friends testified that, after he fell, the Suburban drove toward them, apparently trying to run them over; they ducked behind an electrical box. One of the two believed the Suburban ran over the victim, but he admitted he did not see that happen. A third testified that the Suburban "was in back of" the Sebring "when it was running over" the victim. Two other witnesses, however, were either "sure" or "positive" that the Suburban did not run over the victim.

One witness saw the gunman aim the rifle at the victim as he lay on the ground and pump the rifle three or four times; she saw shells being ejected and falling back inside the sunroof. However, she did not hear a shot. Neither did any other witness, except one, who believed he heard one shot but was not sure. In the parking lot, the police found one .22-caliber bullet, but no bullet strikes and no casings. According to a police officer familiar with firearms, these facts suggested that the rifle misfired.

According to one witness, the driver had a tattoo on his left arm; the gunman had tattoos on his arms and a mustache. Petitioner had no tattoos.

Witnesses who saw the driver and/or the gunman well enough to describe them did not identify petitioner in photo lineups. One witness thought petitioner's friend, Jimmy Ocampo, looked like the driver.

Petitioner returned the Sebring to his girlfriend around 2:15 a.m. The police traced the license number of the Sebring to the girlfriend. The next morning, in cooperation with the police, she made a pretext call to petitioner.

5

She said she had been arrested because her car was involved in a hit-and-run, then asked, "What happened last night?" Petitioner replied, "We never run over no people."

Petitioner was angry that she had not cleaned out "all the shells." He claimed he had told her to clean out the car. He said the bullets in the car "have my fingerprints on 'em." [4]

Petitioner said, "We went to the La R[o]nda and fools start trippin'. So we left, we did not hit nobody." He admitted that there was a gun and bullets in the car, "[i]n case something would happen," "[in] case some fool started trippin." He refused to say who else was in the car with him.

Then he said, "That fool they say we hit. He jumped onto [the] car . . . . He's fucking grab onto it . . . , and we just started socking that fool." "[H]e fuckin' dropped." Blood got on the car, but "[w]e wiped it off."

Petitioner also said, "[T]he sunroof was open . . . and we got out. Well, I got out." "That fool came up, . . . try and fuckin' grab me . . . . I we, I just hold onto him . . . and sock, we just sockin' him . . . . [A]nd that's why I told Jimmy, Let's go . . . ." "[H]e couldn't get under us so we did not run him over or anything." "Somebody else" ran over the victim. However, petitioner also said, "I didn't mean to crash him."

His girlfriend said, "I trusted you with my car." Petitioner replied, "Shut up before I fuckin' kill your ass too."

---

[4] The police found no shells in the Sebring. The prosecution's theory was that, unbeknownst to petitioner, one of his accomplices took them while the group was wiping blood off the car (see *post*).

When told the victim was dead, petitioner laughed and said, "That's funny." He said, "That's what he gets." However, he also said, "[I]t was never meant to happen."

At the end of the call, his girlfriend asked what he wanted her to tell the police. He sighed and said, "Babe, just tell him I, I hit him. I was in the car. Tell them I was driving." "Okay? Just so you can have your life."

II

LEGAL BACKGROUND

In 2018, the Legislature abrogated the natural and probable consequences doctrine as applied to murder. (§ 188, subd. (a)(3), Stats. 2018, ch. 1015, § 2; see also *People v. Gentile* (2020) 10 Cal.5th 830, 849-851.) As a result, an aider and abettor cannot be guilty of murder unless he or she acted with malice. (*People v. Cortes* (2022) 75 Cal.App.5th 198, 205.) This legislative change did not affect the liability of a direct perpetrator.

Under section 1172.6, the trial court must vacate a murder conviction if the petitioner may have been convicted as an aider and abettor under the natural and probable consequences theory (see generally *People v. Prettyman* (1996) 14 Cal.4th 248, 260-263), unless it finds, beyond a reasonable doubt, that the petitioner acted with malice. (§ 1172.6, subd. (d)(3), incorporating § 188, subd. (a)(3).)

A petition to vacate a murder conviction under section 1172.6 must allege that the petitioner:

(1) May have been prosecuted on (among other things) a natural and probable consequences theory;

(2) Either:

    (a) "was convicted of murder . . . following a trial," or

    (b) "accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder"; and

(3) "[C]ould not presently be convicted of murder . . . ." (§ 1172.6, subd. (a).)

As long as the petition so alleges, the trial court must appoint counsel, on request. (§ 1172.6, subd. (b)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 961-970 (*Lewis*).) It must require the prosecution to file a response within 60 days. The petitioner may file a reply within another 30 days. Then the trial court must hold a hearing to determine whether the petition states a prima facie claim for relief. (§ 1172.6, subd. (c).)

If the petition does state a prima facie claim, the trial court must issue an order to show cause. (§ 1172.6, subd. (c).) It must then hold an evidentiary hearing, at which the prosecution has the burden to prove, beyond a reasonable doubt, that the petitioner is guilty of murder even under current law. (*Id*., subds. (d)(1), (d)(3).) Thus, as relevant here, it must prove that the petitioner acted with express or implied malice.

III

THE VALIDITY OF THE TRIAL COURT'S IMPLIED MALICE THEORY

The driver was the perpetrator of the murder. There was substantial evidence that petitioner was the driver; however, there was also substantial evidence that he was not.

8

According to petitioner, the evidence, the jury instructions, and the arguments of counsel allowed the jury to find him guilty on only one of three theories: (1) He was the driver, and he acted with express malice; (2) he was the driver, and he acted with implied malice; and (3) he was not the driver, but he aided and abetted an assault with a firearm, and the murder was a natural and probable consequence of the assault.[5]

---

[5] It is true that, in our opinion in petitioner's direct appeal, we said there were only these three theories. However, this was not necessary to our ultimate holding. Petitioner was claiming there was insufficient evidence to support the conviction on *any* theory. We held, however, that there was sufficient evidence that he was guilty as the driver and also sufficient evidence that he was guilty as an aider and abettor under the natural and probable consequences theory. We therefore had no occasion to consider whether there was sufficient evidence that he was guilty as an aider and abettor acting with implied malice. (See *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388-392 [aiding and abetting with implied malice is a valid theory of second degree murder and survives amendments to section 188].)

It is also true that, in closing argument, the prosecutor focused largely on these three theories. However, he did also argue that petitioner, as the gunman, was an aider and abettor acting with either express malice or implied malice. In fact, he argued that the jury should rely on the natural and probable consequences only if it was not convinced that petitioner was *either* the driver *or* the gunman. Moreover, the jury instructions allowed the jury to convict petitioner as an aider and abettor acting with implied malice. (CALJIC Nos. 3.00, 3.01, 3.31.5, 8.10, 8.11, 8.31.)

The trial court may well have found that petitioner was the gunman, and thus that he aided and abetted the murder with implied malice. After all, in the pretext phone call, petitioner volunteered that he came up through the sunroof, and he socked the victim; he also volunteered that his fingerprints were on the bullets. He did also say he was the driver, but unconvincingly.

The gunman aided and abetted implied malice murder by telling the driver, "Let's go" while the victim was hanging onto the car, and then by socking the victim while the car was going 25 to 35 miles an hour in an effort to make him fall off. He also displayed implied malice by attempting to fire the rifle at the victim (although the rifle evidently misfired). In fact, most likely the trial court found that, *regardless* of whether petitioner was the driver or the gunman, he acted with implied malice.

The trial court found petitioner guilty based on implied malice.  However, it did not make an express finding that he was the driver.  According to petitioner, "The natural and probable consequence doctrine is a theory of implied malice."[6]  Petitioner therefore contends that it *may* have found him guilty as the gunman on a natural and probable consequence theory, which is no longer valid.

The natural and probable consequences theory, however, does not involve implied malice at all.  "[I]mplied malice requires . . . an 'intent to do an act dangerous to human life with conscious disregard of its danger.'  [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 96.)  The natural and probable consequences doctrine, on the other hand, requires that the defendant intentionally aid and abet a target crime, and that the perpetrator commit a greater crime that is, objectively, a reasonably foreseeable consequence of the target crime. (*People v. Gentile*, *supra*, 10 Cal.5th at p. 843.)

Thus, "an aider and abettor can be liable for implied malice murder as a theory independent of the natural and probable consequences doctrine." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713.)  "[T]he natural and probable consequences doctrine constituted an *exception* to the requirement of either express or implied malice for a murder conviction.  [Citation.]" (*People v. Vargas* (2022) 84 Cal.App.5th 943, 953, italics added.)  "[A]n aider and abettor need not personally possess malice, *express or implied*, to be convicted of second degree murder under a natural and probable

---

**6**      Conspicuously, he offers no citation to support this assertion.

10

consequences theory.  [Citation.]"  (*People v. Gentile*, *supra*, 10 Cal.5th at p. 847, italics added.)

In sum, if, as petitioner contends, there are only three possible theories, then *because* the trial court found implied malice, it *necessarily* found that he was the driver. Alternatively, if there were five possible theories (see fn. 5), then it found that he acted with implied malice, as driver *or* gunman, without resort to the natural and probable consequences theory.

Last but not least, "[o]n appeal, we imply any findings necessary to support the court's determination.  [Citation.]"  (*People v. Overing* (2015) 239 Cal.App.4th Supp. 31, 38.)  Thus, even assuming it was error to find petitioner guilty based on implied malice without a finding that he was the driver, we must imply a finding that he was the driver.

IV

RELIANCE ON A THEORY THAT WAS NOT SHOWN

TO BE THE ONE THE JURY RELIED ON

Petitioner also contends that, as a matter of the right to trial by jury and the right to due process, the trial court could not find him guilty on an implied malice theory unless the record shows that the jury also found him guilty on an implied malice theory.

As petitioner candidly concedes, our sister courts have already rejected the premise of this contention.

*People v. Anthony* (2019) 32 Cal.App.5th 1102 (*Anthony*) rejected the argument that allowing a court, rather than a jury, to make a new factual determination of guilt in a

11

section 1172.6 proceeding violates the right to trial by jury. (*Id.* at pp. 1156-1157.) It explained: "[T]he retroactive relief . . . afforded by [section 1172.6] is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights. [Citation.]" (*Id.* at p. 1156.)

*Anthony* cited *People v. Perez* (2018) 4 Cal.5th 1055 (*Perez*), which it summarized as holding that "a trial court may make determinations of fact based on new evidence regarding a petitioner's eligibility for resentencing under Prop[osition] 36 because retroactive application of the benefits from the proposition are a legislative act of lenity that does not implicate [Six]th Amend[ment] rights."[7] (*Anthony*, *supra*, 32 Cal.App.5th at pp. 1156-1157.)

Multiple courts have held similarly that there is no right to trial by jury in a section 1172.6 proceeding. (*People v. Schell* (2022) 84 Cal.App.5th 437, 444; *People v. Silva* (2021) 72 Cal.App.5th 505, 520; *People v. Farfan* (2021) 71 Cal.App.5th 942, 948; *People v. Myles* (2021) 69 Cal.App.5th 688, 702, fn. 4; *People v. Howard* (2020) 50 Cal.App.5th 727, 740.)

*People v. James* (2021) 63 Cal.App.5th 604 (*James*) enlarged on *Anthony*'s "act of lenity" reasoning. It explained: "[A]ppellant was properly convicted of second degree murder under the law that was in effect at the time of his offense and when he entered his

---

**7** Proposition 36 enacted ameliorative amendments to the three strikes law; it also allowed a person already serving a sentence under the three strikes law to petition for resentencing under the amendments. (§ 1170.26.)

guilty plea. Section [1172.6] is 'an act of lenity' that requires, under specified circumstances, reduction of the offense for which he was properly convicted. . . . No constitutional provision required the Legislature to authorize relief under the conditions specified in section [1172.6] and none compels it to make the conditions subject to jury determination." (*Id*. at p. 609.)

*James* noted the holding of *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) that "'"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."'" [Citation.]" (*James*, *supra*, 63 Cal.App.5th at p. 610, quoting *Apprendi*, *supra*, at p. 490.) It concluded, however, that "[t]he rule of *Apprendi* does not apply because [section 1172.6] is designed solely to permit the reduction of a defendant's punishment; no increase is possible over the sentence that has already become final." (*James*, *supra*, at p. 611.)

As a parting shot, *James* noted: "If it were necessary to conduct another jury trial — often, as in this case, years after the conduct in question — it is unlikely that the Legislature would have enacted the procedure in the first place. Indeed, a contrary ruling might well prompt the repeal of section [1172.6]." (*James*, *supra*, 63 Cal.App.5th at p. 611.)

In *People v. Basler* (2022) 80 Cal.App.5th 46 (*Basler*), the defendant raised exactly the argument that petitioner is raising here. There, the jury could have convicted the defendant of murder as a perpetrator acting with express malice, as an aider and

abettor acting with express malice, or as an aider and abettor on a natural and probable consequences theory. (*Id.* at pp. 52-53.) The trial court denied his section 1172.6 petition, finding that he acted with express malice. (*Id.* at p. 53.)

On appeal, the defendant argued that allowing the trial court to find him guilty on a theory on which the jury did not necessarily rely violated his right to trial by jury. (*Basler*, *supra*, 80 Cal.App.5th at p. 61.) The appellate court disagreed. Citing *James*, it stated: "He is not a defendant charged anew with murder and constitutionally entitled to a jury trial." (*Basler*, *supra*, at pp. 61-62.)

Petitioner argues that *Anthony* and its progeny went astray by relying on *Perez*, because Proposition 36, which was at issue in *Perez*, allowed a trial court to redetermine the sentence, whereas section 1172.6 allows the trial court to redetermine guilt. He does not explain why that matters. The right to jury trial extends to both guilt and, under *Apprendi*, to sentencing. Indeed, because *Apprendi* held that a jury trial is not required on a fact that *decreases* the penalty for a crime below the prescribed statutory maximum, it is reasonable to conclude that a jury trial is not required on a fact that *decreases* guilt of a crime below that which has already been adjudicated by a jury.

*Perez* itself relied on *Dillon v. United States* (2010) 560 U.S. 817 (*Dillon*). (*Perez*, *supra*, 4 Cal.5th at pp. 1063-1064.) *Dillon* held that there is no right to a jury trial in a federal procedure, much like Proposition 36 (or Proposition 47), that allows a trial court to reduce an otherwise final sentence in accordance with post-sentencing amendments to the federal Sentencing Guidelines. It explained, in part: "Notably, the sentence-

14

modification proceedings . . . are not constitutionally compelled. We are aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent Guidelines amendments. Rather, [the sentence-modification proceedings] represent[] a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the . . . Guidelines." (*Dillon*, *supra*, 560 U.S. at p. 828.) This reasoning applies as much to a reduction in guilt as to a reduction in sentencing.

Finally, we are persuaded by the *James* court's concern that, if section 1172.6 required jury trials, it might not exist at all, and petitioner might have no possibility of relief whatsoever. And as our own parting shot, we note that if petitioner is correct, *any time* the record did not indicate the theory on which the jury convicted, the trial court could not sustain the conviction on *any* theory; it would *have* to grant the petition. Again, if this were the law, section 1172.6 might well not exist.

This is not a case in which the trial court found the petitioner guilty on a theory that was *never* presented to the jury. We express no opinion on such a case.

V

DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

McKINSTER

J.

MILLER

J.